# FORCE SCIENCE INSTITUTE, Ltd.

124 East Walnut Street - Suite 120    Mankato, MN 56001
USA

507-387-1290    F: 507-387-1291                    T:

September 4, 2008

Ms. Karen Rogan,
Lewis, Brisbois, Bisgaard, @ Smith, LLP
550 West C Street, Suite 800
San Diego, CA 92101

**RE: Sergio Lopez v. City of Chula Vista Police Dept.
USDC No. 07 CV 1272 WQH BLM**

Dear Ms. Rogan:

Thank you for the kind invitation to work on this case. I have reviewed and considered the following material:

Items Received August 25, 2008:
1. Amended Complaint
2. ICE Enforcement Operation Plan
3. Closed Incident Reports
4. Call History Details
5. Supplemental Officer Reports
6. Claim for Damages
7. Photographs of Plaintiff
8. Deposition Transcript of Officer Armstrong
9. Deposition Transcript of Steven Forbes
10. Deposition Transcript of Donald Clark
11. Deposition Transcript of Gary Guthrie
12. Deposition Transcript of David Martinez
13. Memo concerning Arrest of Sergio Lopez

First I will introduce myself to those who are reading this report and are unfamiliar with either myself, or the Force Science Research Center and the Force Science Institute.

1. I am the director of the Force Science Research Center at Minnesota State University, Mankato, Mankato, Minnesota, U.S.A., where I have been a professor in the Law Enforcement Program for 27 years. My professional background and experience in the training and evaluation of police officer shootings and in the analysis of human perception, judgment, memory, reaction time, behavior, etc., are outlined in the attached CV and related materials and won't be repeated

1

here except for the brief paragraphs below. Those supporting documents provide the foundation for the professional opinions that follow.

2. I am conducting the leading research into human performance in lethal force encounters. I have examined hundreds of officer-involved shootings in minute detail and interviewed, advised or counseled over a thousand officers who have been in lethal force encounters. My current research focus is on subject and officer movement in lethal force encounters as well as action/reaction parameters (including judgment, judgment time), perception and memory. My research has been presented in the Journal for the Association of Crime Scene Reconstruction and in the Law Enforcement Executive Forum, at peer-reviewed conferences in both criminal justice and engineering, has been published in national law enforcement publications, websites and e-news lines and been presented nationally and internationally in law enforcement conferences and seminars throughout North America and the United Kingdom. It was highlighted on *48 Hours Investigates*. The BBC filmed our research work for a science documentary that was aired in Oct. of 2007. My most recent studies involved a very technologically sophisticated investigation into the perceptual and psychological factors that impact on an officer's perception and reaction time and ability to report on information from a lethal force encounter. All publications and news lines that contain our research are available on the Force Science Research Center's website at www.forcescience.org. My analysis of the time and motion elements of shootings and the subsequent issues of perception and memory have been accepted throughout the United States in Grand Juries, Criminal Courts, State and Federal Courts. The Force Science Research Center News Line which delivers our research as well as that of other universities to the law enforcement community has an estimated, combined distribution to 750,000 officers world wide and select articles are loaded up by the International Association of Chiefs of Police on their password protected website for distribution to police chiefs world wide.

3. I have qualified as an expert on action/reaction, perception, judgment and memory in force or lethal force encounters in criminal courts in Arizona, Ohio, California, Florida, Maryland, and Manitoba, Canada. I have also qualified as an expert in federal or state court in California, Oregon, Kansas, Maryland, Texas and Washington on the same topic.

4. Besides having courts in a number of jurisdictions accept my testimony in this area, as indicated, I have had graduate course work in physiological psychology and perception, including a major research project in perception. I have a Ph.D. in Police Psychology with course studies related to and a dissertation focused on training techniques for critical incident decision-making. I was a consulting expert on this topic and contributed portions of the chapters on it, in the text, "The Tactical Edge" which is one of the best selling texts in law enforcement in the western world. I also wrote the script on this portion for the "Street Survival Seminar." This seminar information was delivered to over 100,000 law enforcement officers throughout Canada and the United States. I also currently teach this topic area in the Law Enforcement Program at Minnesota State University, Mankato. I have taught or consulted on this area to the FBI – both regionally and at Quantico, the FAA Sky Marshals, U.S. Customs, and to a variety of other federal, state and local agencies through international, national and regional seminars that I have given on the topic. For example, in Oct. of 07, I presented on the Force Science Research Center and its research to an international seminar of law enforcement executives, convened by the FBI

2

and conducted at the national leadership, training center (Bramshill) in England. I have also done two presentations on our research in London, England, to a Criminal Justice Committee and a Human Rights Committee from the Houses of Parliament – both the House of Commons and the House of Lords. I also wrote an article for the Police Marksman on, "Stress Reactions Related to Lethal Force Encounters." An article coauthored with Dr. Honig, entitled "A Survey of the Research on Human Factors Related to Lethal Force Encounters" was published in The Law Enforcement Executive Forum in August.

5. Publications on our research are or will be posted on the Force Science Research website or the research can be reviewed in the Force Science News.

**REPORT:**

This is my written report on the opinions I have on this incident based upon my training, experience, research and a review of the material indicated.

**CONTEXT:**

1. All behavior occurs within a context. That context is used to define the meaning of the behavior. In this case, for instance, most law enforcement officers would normally not have any problem working with officers from another agency. However, in this incident, Mr. Lopez by his atypical behavior created a context that led the officers to consider everything he said and did with a high degree of suspicion. Initially Mr. Lopez was driving at a high rate of speed and had what appeared to be emergency lights on his vehicle activated. When the officers attempted to pull him over he continued to drive and did not immediately pull over. When the officers finally had him stopped he emerged from his vehicle in a non-compliant, confrontational fashion. When he exited his vehicle in the manner observed by the officer and then proceeded to berate them and not comply with their orders, he further behaved in a way that created a great deal of suspicion about his identity. This created the context or perspective that the officers were operating from. As the officers noted, this behavior was not typical of another law enforcement officer and for them it immediately became a situation they had to control.

2. The officers from the very start were faced with a very dissonant, conflictual situation. Mr. Lopez's vehicle had the partial appearance of a law enforcement vehicle but that appearance did not match with Mr. Lopez's behavior. The officers stated that they needed to investigate this incident. They were accurate. Government information that I reviewed several years ago indicated that in the United States every year there are approximately one hundred thousand incidents of impersonation of a law enforcement officer by non-law enforcement persons who were attired in variety of uniforms and had their vehicles "decked out" with a variety of police related accoutrements. The information about the frequency of impersonations is present even in the public media. For instance a source on Wikipedia indicates that the FBI noted that annually individuals impersonating a law enforcement officer commit approximately ten thousand crimes. New York Police Department annually arrest approximately 100 persons who are impersonating a law enforcement officer. They even have a specialized unit (Group 51) dedicated to this task of investigating officer impersonations. Considering that many more cases of this type are reported than arrests made it can be concluded that the impersonation of a law enforcement

3

officer is not an unusual problem that officers face. Therefore, within the context of this incident, the officers stated they had to then investigate Mr. Lopez by looking for some evidence of Mr. Lopez's official affiliation. This was difficult, given his behavior and demeanor.

3. Mr. Lopez, by being non-compliant, not only aroused the officers' suspicion about his identity but also created an imminent and even an immediate threat to the officers. They stated they had to put him in handcuffs to conduct an investigation into his statements. They had to do this for their convenience and also for their own safety. For instance, an uncooperative subject who is armed, once they have their hand on an untethered handgun, can pull that gun and fire within a quarter of a second and do so with a high degree of accuracy out to a distance of fifteen to twenty feet. Subjects who have access to knives can be very dangerous out to well over twenty feet. Clearly, subjects who are not in control or who are acting in a uncontrolled fashion are a very significant danger to law enforcement officers. This means that the officers, for their own safety, had to control an uncooperative and resistant Mr. Lopez by cuffing him, so they could conduct an investigation into the incident.

4. It should be noted that even if Mr. Lopez had no intention of creating the identity confusion, it was he who created this incident by acting in a fashion that was atypical for a fellow law enforcement professional to behave. It was even more atypical for him to not clearly and very compliantly provide identification, especially when confronted on a traffic stop by uniformed, armed officers, who had just stopped him, and had their weapons out.

5. Therefore, whether intentionally or not, Mr. Lopez, by his behavior, created the impression that he was not a fellow law enforcement officer. Within the context of Mr. Lopez's behavior and given the risks faced by them if they did not control him -- the officers actions, from a behavioral science perspective, were logical and reasonable.

If I can provide any further information, please contact me.

I reserve the right to amend this report should further information become available to me.

I also reserve the right to illustrate the points made in this report with demonstrations and demonstrative videos.

Sincerely,

William J. Lewinski, Ph.D.

4