# *I*nvestigations *D*ivision



**Spirit of Excellence**

Richard P. Emerson
Chief of Police

Division Commander
Capt. Leonard Miranda

Investigations Lt.
Lt. Gary Ficacci

Special Investigations
Unit Supervisor
Sgt. Dale Bourgeois

Special Investigations
Unit

Agent Chris Kelley
Officer Michael Varga
Analyst Kristen Miggans
Office Specialist
Beverly Schanke

*I.C.E. Representatives*
Agent Matt Hardesty
Agent Mark Meredith
Officer David Beatty

*FBI Representatives*
Agent Martin Brady
Officer Ricardo Cruz

*NTF Representative*
Agent Don Clark

*US Marshals
Representative*
Agent Scott Adkins

*JTTF Representative*
Agent Dave Marshall

*RCFL Representative*
Agent Brett Rhoades

| | |
|---|---|
| **Date:** | **September 2nd, 2008** |
| **To:** | **Bart Miesfeld, City Attorney** |
| **From:** | **Sgt. Dale Bourgeois** |
| **Re:** | **Case Opinion; Sergio Lopez v. City of Chula Vista** |

I'm a Sergeant for the Chula Vista Police Department and am currently assigned to the Special Investigations Unit. I supervise eleven "plain-clothes" detectives who are assigned to various Task Forces in San Diego. I have worked for the Chula Vista Police Department for twenty years and have held various assignments. Some of those assignments relative to this case are:

- 1996-1998 Narcotic Enforcement Team (NET)/Officer
  - Street level narcotic team
  - Surveillance operations
  - Tactical planning
- 1998-1999 Narcotic Task Force (NTF)/Agent
  - DEA funded, Mid-high level narcotic team
  - Surveillance operations
- 1999-2000 Special Investigations Unit/Agent
  - VICE U.C. operations
  - Surveillance operations
- 2005-Present Special Investigations Unit/Sergeant
  - Supervisor
  - NIN coordinator

Relative Training Courses:

- 1991  8 hour CNOA Narcotic Officer Safety Techniques
- 1996  40 hour CNOA Conference
- 1996  80 hour by DEA Narcotics Investigations
- 1997  40 hour CNOA Conference
- 1998  40 hour CNOA Conference
- 2005  40 hour CNOA Narcotics Supervisor Course
- 2006  8 hour CNOA Undercover Operations

I have reviewed Chula Vista Police case #06-023027 as well as depositions from Sergeant Fobes and Guthrie, Agent Clark and Officer D. Martinez in regards to this matter. There are several issues I would like to comment on.

I feel it's important to clarify the difference between an Undercover Operation and a Surveillance Operation.

An **Undercover Operation** is one in which an officer or agent is actually negotiating with a suspect. This officer or agent is posing as a suspect themselves and has put themselves at a greater risk then someone working a surveillance operation. The "Under-Cover" or U.C. is at risk of being exposed as an officer or agent or even at risk of being robbed, kidnapped, assaulted or killed. U.C. operations can be extremely dangerous and security is taken very seriously by all involved.

A **Surveillance Operation** is more common among law enforcement and normally consists of several plain clothes officers or agents watching a target(s) which can be static or mobile. Often there are informants involved, but these are still considered surveillance operations and not a U.C. operation. Surveillance operations are less dangerous as officers and agents are not on a face to face basis with the suspect(s).

## The Incident

A Chula Vista Police CAD print-out indicates Border Patrol agent Mark Gonzalez called our dispatch center on 10/18/06 at 1900 hours. Gonzalez indicated they were going to be in the area of Industrial Blvd and "L" Street until about 2400 hours. Gonzalez gave the following unmarked vehicle descriptions to dispatch: a red Chevy Blazer, blue Intrepid, tan Dodge Stratus and a silver Dodge Magnum. There is no indication of a silver Pontiac being involved.

Without seeing the TAC or operations plan found in Sergio Lopez' vehicle, all indicators point to the ICE team being involved in a surveillance operation. Surveillance operations normally consist of numerous plain clothes detectives and vehicles in order to properly maintain covert surveillance on a target. On several accounts, Lopez claimed he was involved in an operation where lives were at risk, hence his high speed and failing to stop for red signals. It's my opinion this was not the case at all, he was merely trying to get back to a surveillance operation.

Their surveillance operation was in the 1000 block of Industrial Ave. Armstrong first saw Lopez' vehicle on Broadway, north of H Street, a driving distance of two miles. I cannot find an explanation as to why Lopez was so far away from the operation he was assigned to. If Lopez was needed for the surveillance, he put himself in a difficult situation by being so far away. Having the radio communications could shed some light as to why he was so far away from their operation. Running "code 3" through red lights and driving at a high rate of speed to get to a surveillance operation puts him and others at an unjustified risk. Code 3 operations are for emergency situations. There is no indication of an emergency other then Lopez' statement of lives being at risk. A CVPD officer would be disciplined for driving the way Lopez did.

Lopez drove his vehicle through a red light at the intersection of Broadway and H Street using only his emergency lights. In order for an emergency vehicle to be covered under the vehicle code, Lopez is required to use both his emergency lights and

siren before proceeding through a red light. It was at this time that Armstrong activated his emergency lights and siren to stop Lopez for the violation he witnessed. Lopez is assigned to a Federal agency whose primary responsibility is working plain clothes assignments such as U.C. and surveillance operations. That being said, Lopez should be held to a higher expectancy of "awareness" of his surroundings. I'm at a loss for an explanation as to why Lopez failed to stop for Armstrong for 1.3 miles.

Law enforcement officers are trained that generally, it is much safer to keep a vehicle's occupants inside the car during a traffic stop. Lopez should know that getting out of his vehicle in an angry or aggressive manner is going to put uniformed officers on alert that something isn't right; agents/officers don't normally act this way when being stopped by other law enforcement. In fact, officers are trained that this can sometimes be a diversionary tactic used by criminals. Lopez cannot assume that the officers are aware of his employment as a Federal agent. He is driving an unmarked vehicle, wearing plain clothes and is not readily identifiable as a law enforcement official.

Armstrong was legally authorized to stop Lopez for the vehicle code violation (running a red light) and to investigate an unmarked vehicle having emergency lights. Over the years the Special Investigations Unit has released several information bulletins to sworn personnel reference violent criminals using police equipment during their crimes. We have documented incidents of criminals wearing raid gear with "Police" emblems and badges as well as red and blue emergency strobes while conducting criminal activities. I've attached some of these bulletins to this report.

Criminals are using police equipment to rob their victims and protect themselves in the event of a shoot-out with their intended "victim(s)" or the police. It has become more and more difficult for uniformed police officers to know if they're dealing with an actual plain clothes officer or a criminal.

It is the plain clothes detectives' responsibility to identify themselves in a safe manner to the uniformed officers for obvious reasons. Over the course of my twenty years I've been stopped by uniformed officers on several occasions while working plain clothes assignments. I've also stopped several plain clothes officers while working patrol assignments. Generally, the plain clothes officer will wait in the car with the window(s) down and let the uniform officer know they're an armed officer/agent working in the area, driving a department vehicle. The uniform officer will ask to see their official identification. After verifying their identification, the plain clothes officer will normally be released and sent on their way. This takes about two minutes to complete.

In this case, Lopez exited his vehicle and began cursing at the officer(s) for stopping him. There is a dispute as to whether or not Lopez "flashed" or "waived" his badge, or even displayed it at all. Armstrong's report stated Lopez was not displaying anything that identified him as law enforcement. Martinez' report stated Lopez "flashed" a badge at them. Clark's report states Lopez was waiving a wallet and when asked, refused to give Clark his credentials.

It seems clear Lopez was agitated and yelling obscenities at the contacting officers, something that would cause any reasonable officer to question Lopez' statements of being a Federal agent.

Regardless of whether or not Lopez was in fact a Federal agent, the officers were obligated and duty bound to continue on with this contact. Additionally, Lopez had violated several vehicle codes and was also delaying and obstructing the officers in their official duties. The officers approached Lopez and grabbed his arms or wrists. Lopez tried to pull away from the officers instead of letting them control him. Lopez' actions of actively resisting the officers escalated the force used against him. Officer Martinez removed his Taser cartridge and placed the Taser against Lopez' stomach, telling him to stop resisting. Lopez was then placed on the ground and handcuffed. The force used on Lopez was appropriate and dictated by the actions conducted by Lopez.

It is my opinion that Lopez' actions were not only unprofessional, but rise to a level of conduct unbecoming of a law enforcement official. Lopez violated several vehicle codes while driving towards his surveillance operation and also delayed the officers in their official duties.



## CHULA VISTA POLICE DEPARTMENT
### Intelligence Brief

# POTENTIAL TERRORIST USE OF EMERGENCY VEHICLES

**Brief Number:** 04-032
**Distributed:** October 26, 2004

**Security Classification:** RESTRICTED to Law Enforcement Personnel.

**Geographic Area(s):** Nationwide

**Subject:** Potential Terrorist Use of Emergency Vehicles to Circumvent Security Procedures

**Further Information:**    Sgt. Lon Turner, SIU Sergeant, ████████████████
                            Mark Goldberg, SIU Intelligence Analyst, ████████████████

## EXECUTIVE SUMMARY

**The information provided in this brief was sourced from FBI Intelligence Bulletin No. 151, and is FOR OFFICIAL USE ONLY (FOUO).**

FBI intelligence indicates that terrorist planners consider emergency response vehicles an ideal tool for use in impersonating first responders while attempting to circumvent security procedures. There is no specific intelligence available to indicate terrorists are planning to use emergency vehicles in attacks against domestic targets. However, emergency vehicles have been used in multiple incidents overseas, including a June 2004 incident in which Al-Qaeda operatives used a police vehicle to stage a fake roadblock, then kidnap and subsequently murder an American citizen.

## DETAILS

FBI analysis of the tactics used by the terrorists and the Russian first responders points to a number of issues that should be considered by law enforcement and school officials:

* There are strong indications that the terrorists had pre-positioned a large cache of weapons, possibly hidden within construction equipment placed throughout the school. School workers also reported seeing false-fronted walls that were dug out during the attack to serve as sheltered firing positions. If these accounts are true, they would indicate that the terrorists had been planning the operation for months, and had conducted extensive pre-operational surveillance.
* Learning from the October 2002 siege of a theater in Moscow, during which Russian commandos employed an incapacitating chemical agent, the terrorists knocked out all of the windows in an attempt to improve ventilation. Some reports also indicated that the terrorists brought gas masks and dogs to alert them to the use of gas.
* The terrorists separated the children from the parents and teachers, and placed some of the children near the windows to discourage any attempts to raid the building.
* The building was wired with a minimum of fifteen improvised explosive devices (IEDs), and reports indicate that several of the leaders had the ability to detonate all of the explosives. This is another example of the terrorists changing their tactics – during the Moscow siege, no single terrorist had the ability to detonate all of the explosives at once.
* A number of reports pointed to the Russian authorities' inability to maintain a clear chain of command throughout the incident, as well as their failure to establish and maintain a secure perimeter.

The surveillance phase provides the greatest opportunity for citizens and/or law enforcement to detect and disrupt terrorist operations. When taken individually, each of the pre-incident indicators listed below

Sgt. Lon Turner _____          Lt. Tro Peltekian _____          Capt. Ken Dyke _____



# CHULA VISTA POLICE DEPARTMENT
## Intelligence Brief

# SUSPICIOUS INCIDENT

**Brief Number:** 07-008
**Distributed:** April 9, 2007

**Security Classification:** Restricted to law enforcement personnel

**Geographic Area(s):** San Diego County

**Subject:** Suspicious Crown Victoria

**Further Information:** Sgt. Dale Bourgeois, SIU Supervisor, ███████████████████████
Kristen Miggans, SIU Public Safety Analyst, ████████████████████████

## EXECUTIVE SUMMARY

The information provided in this brief was sourced from the CA State Terrorism Threat Assessment Center (STTAC) April 6th Morning Update.

## DETAILS

Law Enforcement in Spring Valley, CA observed a suspicious dark-colored unmarked Ford Crown Victoria with antennas, police style push bumpers, roof mounted emergency lights, and a prisoner cage. The driver wore a full uniform with patches for a security company that does NOT have a valid state license. The vehicle is registered to a "████████████████████" which is an unregistered security company and NOT a government vehicle.

Please be on the lookout and notify SIU if you encounter similar vehicles.



## CHULA VISTA POLICE DEPARTMENT
### Intelligence Brief

# FORMER AFO MEMBER CONDUCTING KIDNAPPINGS IN SAN DIEGO COUNTY

**Brief Number:** 07-002
**Distributed:** January 29, 2007

**Security Classification:** Restricted to law enforcement personnel

**Geographic Area(s):** San Diego County

**Subject:** Former AFO Member – ▓▓▓▓▓▓▓▓▓▓

**Further Information:** Sgt. Dale Bourgeois, SIU Supervisor, (619)▓▓▓▓▓▓▓▓▓▓
Kristen Miggans, SIU Public Safety Analyst, (619)▓▓▓▓▓▓▓▓▓

**File Number:** 100.03.01

### EXECUTIVE SUMMARY

▓▓▓▓▓▓▓▓▓▓, a previous AFO member, formed his own enforcement group and has since been conducting local kidnappings for ransom.

### DETAILS

▓▓▓▓▓▓▓▓▓▓ is a former Arellano-Felix Organization (AFO) enforcer who was alienated from the AFO. Over the past two years he has recruited local gang members, parolees, and former AFO enforcers to conduct anti-AFO operations in San Diego County. He is suspected of conducting local kidnappings for ransom and of being involved in at least 2 local murders. ▓▓▓▓▓▓▓▓ is also believed to have led the assault on a Chula Vista Police Officer on September 28, 2005.

▓▓▓▓▓▓▓▓ is purchasing police uniforms for use during drug rips and kidnappings. He is well trained in police type operations and is likely training local criminals to do the same. Sources claim that ▓▓▓▓▓▓ ▓▓▓▓▓ dressed in police gear and driving a minivan, kidnapped a subject ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ from an Otay Ranch home on ▓▓▓▓▓▓▓▓▓ The crime was not reported, but the victim's father paid a ransom of ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ has recently been seen in the company of ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ was the victim of an attempt murder at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ about 3 years ago. He also has been seen downtown driving a Ford 150 truck.

Please forward any information to SIU. If you encounter this subject please use extreme caution.

Approx:▓▓▓▓▓▓
Height:▓▓▓▓
Weight:▓▓▓▓▓
Hair: Brown
Light Complexion







# CHULA VISTA POLICE DEPARTMENT
## Intelligence Brief

# OFFICER SAFETY REMINDER

**Brief Number:** 07-018
**Distributed:** June 12, 2007

**Security Classification:** Restricted to law enforcement personnel
**Geographic Area(s):** Chula Vista, San Diego County

**Subject:** Kidnapping Groups

**Further Information:** Sgt. Dale Bourgeois, SIU Supervisor, (619) ▇▇▇▇▇▇ / ▇▇▇▇▇▇▇

## EXECUTIVE SUMMARY

As a reminder, groups similar to the group who shot at Officer ▇▇▇▇▇ are still active in the County of San Diego and our own City. These groups are involved in drug "Rips" and kidnappings for ransom. They are sophisticated and have been known to use communication equipment, high-powered weapons, and dress as police officers during their operations.

The picture below was from a case by Agt. ▇▇▇▇ and involved a similar type of operation. This photo was taken after a search warrant in Chula Vista (Sector 3) and shows the level of sophistication involved. In light of a recent 207pc over the weekend, please be aware how these groups operate.



•In the residence, Agents found chains, locks, a Taser and numerous handguns strategically placed around the house.



Case 3:07-cv-01272-WQH-BLM     Document 83-3     Filed 12/11/09     PageID.1251     Page 9 of 20

•In the kitchen an M4 and two AK47's were found.



•In one of the bedrooms, agents found police equipment consisting of red/blue emergency lights, radio's badges....



Case 3:07-cv-01272-WQH-BLM    Document 83-3    Filed 12/11/09    PageID.1254    Page 12 of 20

●....ballistic vests, hats and other clothing with police embossed on them.





# INGLEWOOD POLICE DEPARTMENT
# ALERT - Possibly
# Impersonating Police Officer

### CITY OF INGLEWOOD, CALIFORNIA
ONE MANCHESTER BOULEVARD / P.O. BOX 6500; INGLEWOOD CA 90301

February 28, 2008                                      Bulletin # 08-013

The Inglewood Police Department received information from an online custom identification card company, "See My ID," regarding a suspicious subject, ▓▓▓▓▓▓▓▓ who ordered an IPD identification card online (the card was later sent to IPD). The ID card was ordered with the subject's true name, photo and physical descriptors. The ID card is dissimilar to the actual Inglewood Police ID card as well as the badge on the card itself.

**This is an informational bulletin only, as ▓▓▓▓▓▓may be good for crimes involving impersonating a police officer. He has also outfitted his personal vehicle to look like an undercover police vehicle. (see photos on page 2).**



Bkg Photo
05/06

**DESC:** MB ▓▓▓▓▓▓▓ BLK/BRO
**DOB:** ▓▓▓▓▓▓▓
**RES:** ▓▓▓▓▓▓▓▓▓▓
**CDL:** ▓▓▓▓▓▓▓
**CII:** ▓▓▓▓▓▓

**PRIORS:** ID theft, forgery, false impersonation, burglary, grand theft and weapons violations

Front          Back

▓▓▓▓ purchased this fake police ID card for $15, (complete with a watermark "security" feature) from "See My ID." Because this company sells ID cards online, be aware, as they may show up in other jurisdictions during routine t-stops/investigations.

**Pictures of ▓▓▓▓▓ vehicle are on the following page.**

Any information or questions please contact ▓▓▓▓▓▓▓▓▓▓▓

Inglewood Police Department                    JACQUELINE SEABROOKS
Detective Bureau Contact ▓▓▓▓▓▓▓              Chief of Police

**FOR LAW ENFORCEMENT USE ONLY**



1998 Ford Crown Victoria, white, 4-dr
LIC: ▮▮▮▮▮▮
Outfitted to look like an undercover police vehicle and equipped with:
- Spotlights
- Rear strobe lights
- Front take down light
- MDC (mobile digital computer)
- Badge in center console

 

 

Inglewood Police Department
Detective Bureau Contact #▮▮▮▮▮▮

JACQUELINE SEABROOKS
Chief of Police

**FOR LAW ENFORCEMENT USE ONLY**

Bulletin # 08-013        Page 2



## CHULA VISTA POLICE DEPARTMENT
### Information Bulletin

**Brief Number:** 08-012
**Distributed:** August 15, 2008

**Security Classification:** Restricted to law enforcement personnel

**Geographic Area(s):** State of California

**Subject:** Impersonating Law Enforcement Officer

**Further Information:** Sergeant Dale Bourgeois
Agent Dave Marshall
Analyst Kristen Miggans



## EXECUTIVE SUMMARY

███████████████████████████ residing at ███████████ Chula Vista, CA 91913 is currently driving a 1998 black Ford Expedition ███████████ equipped with emergency lights (red and blue) and strobes. The emergency lights are located on the front passenger visor; the strobes are wired into the head/ tail lights. ███████ was arrested by CVPD in 2004 for pulling over an ambulance while they were driving a patient to an emergency room. He forced the ambulance to yield then passed it up. Upon police contact he claimed to be a retired DEA agent. CVPD was able to determine ███████ is not a retired law enforcement officer. On August 6, 2008 ██████ was stopped by ██████ Police for driving near the campus with his emergency lights activated. ██████ told the officer he was a retired Texas law enforcement officer. In 2004 ██████ claimed to have a Ruger .38 handgun at his residence. There is no record of him having a registered firearm in California.

 

Picture of ██████ vehicle impounded by CVPD in 2004.

FOR OFFICIAL USE ONLY



# BUREAU OF DIPLOMATIC SECURITY
## LOS ANGELES FIELD OFFICE
### San Diego Resident Office



April 14, 2008

## BOLO- IMPOSTER DIPLOMATIC IDENTIFICATION

The following are examples of fraudulent diplomatic badges, credentials, and license plates that have been used by individuals, so-called 'sovereign citizens,' to circumvent airport security, enter controlled access facilities, cross into the United States, smuggle prohibited weapons across state lines, avert paying taxes and circumvent law enforcement officers throughout the United States. Please note that the US State Department does not issue badges to foreign diplomats and the false credentials and license plates being used do not resemble genuine diplomatic credentials issued by the US Department of State. If encountered, please detain and immediately contact the US Department of State - Diplomatic Security Service.

For San Diego cases please call ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and border cases should be referred to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇. All others should contact the Diplomatic Security Service Command Center at 571-345-3146.





FOR OFFICIAL USE ONLY

# MAN ARRESTED FOR IMPERSONATING A U.S. IMMIGRATION OFFICIAL - FOLO

Crime Blotter



These pages provide information, news releases, and announcements obtained from communication and public relations offices.

author's email

author's web site

view author's other articles

**Join this author's mailing list**

Your Name:

E-mail Address:

Sign up

Crime Blotter
April 02, 2008
On Monday investigators from the Chula Vista Police Departments Special Investigations Unit received information from patrol officers that a suspect named Davyd Jimenez was fraudulently posing as a Department of Homeland Security (DHS) Immigration Official.

While posing as an immigration official, the suspect accepted payment via money orders from victims who believed he would assist them with completion of immigration paperwork. Chula Vista Police Department Special Investigations Unit Investigators confirmed that Jimenez was not an employee of any Federal agency.

On 4/1/08 surveillance was established on Jimenez' silver 2007 Jeep Cherokee. Jimenez was stopped after driving away from his residence at 370 D Street in Chula Vista and placed under arrest for being in possession of a hypodermic needle and driving without a CA drivers license. Detectives located fraudulent federal agency badges, fake Department of Homeland Security identification, fake Department of Homeland Security business cards and counterfeit stamps and forms. Jimenez also had emergency vehicle strobe lights and documents taken from some of the victims he had been in contact with.

Detectives learned that Jimenez method for bilking victims was to meet with victims at their homes or

California Chronicle | MAN ARRESTED FOR IMPERSONATING A U.S. IMMIGRATI...    Page 2 of 2

various restaurants, including the Denny's restaurant in the 600 block of E Street in Chula Vista. He would charge victims between $900 and $1,000 to file "official" paperwork for entry into the United States. Jimenez would show his fraudulent credentials and badge to the victims to convince them that he worked for the Department of Homeland Security.

**Stop Illegal Immigration**
In your state. Sign our petition. No sanctuary for illegal aliens!
www.SanctuaryBusters.org

**Talk To A Lawyer Now**
Fill Out Our Form - Free Immigration Lawyers Respond Fast
www.FindLawyersAttorneys.com

**Money Order Service**
Search For Money Order By Location At Local.com!
Local.com

**Online Immigration Visas**
Access Immigration attorneys online - save time & money.
www.visanow.com

Ads by Google

Jimenez accepted cash or U.S. Postal Service money orders. He would fill out the carbon copy indicating the money order was being paid to the "State Department" or the "US Embassy". He would later fill out the payee section with his own name and cash the money orders, keeping the fees and never turning in any of the immigration documents.

Immigration and Customs Enforcement representatives are assisting with the investigation and will seek Federal prosecution of Jimenez for impersonating a federal official.

Jimenez was booked into County Jail on various felony fraud and drug charges. His bail was set at $750,000 as he was about to leave the area.

There's evidence showing Jimenez traveled through Tennessee, Texas and Arizona. If you believe you've been a victim of this case, please contact the Chula Vista Police Department at (619) 691-5151 or you can call Crimestoppers at (888) 580-TIPS.

Davyd Jimenez 4/1/2008



HOMELAND
SECURITY
USCIS





RED & BLUE STROBES FOUND IN VEHICLE