# *E. J. Pellegrino-Use of Force/Police Procedure Consultant*

*7560 Navigator Circle Carlsbad, CA 92011*

*Tel: 760 918-6968; Fax: 760-918-6969*

*epellegrino@fullcoll.edu*

January 24, 2008

Ms. Karen L. Rogan
LEWIS BRISBOIS BISGAARD & SMITH LLP
Attorneys At Law
550 West "C" Street, Suite 800
San Diego, California 92101

RE: Federal Rule 26 Report:

Sergio Lopez v. City of Chula Vista Police Dept., et al.

United States District Court Case No. 07 CV 1272 WQH BLM

I was retained as a police procedures expert by Mr. Bart C. Miesfeld, Assistant City Attorney, City of Chula Vista, to render opinions regarding the propriety of the conduct of the defendant officers and the City of Chula Vista Police Department, in the subject incident involving Mr. Sergio Lopez.

My opinions in this case are the results of over 43 years of law enforcement experience, training and knowledge of this area of police practice and procedures. I have qualified as an expert witness on the use of force and police procedures in over 250 cases since 1976 in federal and state courts in Hawaii, Arizona, Oregon, Colorado, Montana, Florida and California. Attachments include my curriculum vitae, fee schedule and list of cases since 1992 that I have testified in either deposition or trial as an expert witness.

I have personally reviewed the specifics of the incident involving Mr. Sergio Lopez. These sources of information include, but are not limited to the following documents: Plaintiff's Amended Complaint; ICE enforcement operation plan; closed incident reports; call history details; supplemental officer reports; claim for damages; and Video taped Depositions of G. Armstrong, S. Fobes, D. Clark, G. Guthrie and D. Martinez.

I reserve the right to amend or expand my opinions if any additional documents become available.

## SUMMARY OF EVENTS

On October 19, 2006, at approximately 9:22 p.m., Chula Vista Police Department Uniformed Officer G. Armstrong was patrolling northbound on

1

Broadway Avenue in a marked police vehicle. The officer observed a Gold
Dodge Stratus, bearing California License Plate Number UZN988, travel-
ing at a high rate of speed, southbound on Broadway Avenue with it's
headlights flashing on and off, similar to that of a police vehicle. The vehi-
cle did not have any visible police markings or other lights, nor did Officer
Armstrong hear any audible siren emitting from the vehicle.

Officer Armstrong immediately made a U-turn and proceeded southbound
on Broadway Avenue. At this time, the officer observed red and blue lights
flashing in the rear window of the Dodge Stratus. The officer advised
Chula Vista Police Department Dispatch that he was following a vehicle
which was traveling southbound on Broadway Avenue with red and blue
lights flashing in the rear window and no audible siren.

When the Dodge Stratus reached the intersection of H Street and Broad-
way Avenue, it came to a brief stop and then proceeded through the inter-
section against a red light, and continued to travel southbound on Broad-
way Avenue. At this time Officer Armstrong activated the emergency
lights and siren on his marked police vehicle and continued to follow the
Dodge Stratus.

In the interim, Chula Vista Police Department Uniformed Agent D. Clark
was parked on the 500 block of Sierra Way, when he heard Officer Arm-
strong broadcast, via his police radio, that he was following an unmarked
vehicle with flashing police lights southbound on Broadway Avenue.
Agent Clark immediately proceeded to the 800 block of Broadway Avenue,
stopped his marked police vehicle and waited for the Dodge Stratus and
Officer Armstrong's vehicle to pass him.

Agent Clark stated that when the two vehicles' passed his location he ob-
served rear amber lights flashing in the rear window of the Dodge Stratus,
additionally, the vehicle did not have an audible siren. Agent Clark also
noted that Officer Armstrong was approximately 2-3 car lengths behind
the Dodge Stratus, with his emergency lights and siren activated. Both
vehicles passed Agent Clark's vehicle at a high rate of speed and Agent
Clark pulled in behind Officer Armstrong's vehicle.

In the interim, Chula Vista Police Department Uniformed Officer D. Marti-
nez was patrolling in the 500 block of Naples Street when he heard Officer
Armstrong broadcast that he had observed an unmarked vehicle traveling
southbound at the 500 block of Broadway Avenue with a red and blue light
and head lights flashing. Officer Martinez also stated that Officer Arm-
strong broadcasted that the vehicle, a Dodge Stratus, was traveling at a
high rate of speed with no audible siren.

Shortly thereafter, Officer Martinez heard Agent Clark broadcast that he
was following Officer Armstrong and the officers' vehicles were traveling
westbound on L Street from Broadway Avenue. Officer Martinez who was
now at the 900 block of Broadway Avenue, observed Officer Armstrong
and Agent Clarks' vehicles traveling westbound on L Street. Officer Mar-

2

tinez pulled in behind the officers vehicles as they proceeded westbound on L Street.

When the driver of the Dodge Stratus reached the 800 block of L Street, he turned off the vehicle's red and blue flashing lights. The vehicle continued west on L Street and then made a right turn onto Woodlawn Avenue, and then came to a "quick stop". Note: Officer Armstrong's police report describes the location of the vehicle stop as the 800 block of Madison Avenue.

The driver of the Dodge Stratus, subsequently identified as Sergio Lopez, quickly exited the driver's side of the vehicle and yelled, "What the fuck are you guys doing? I'm a federal agent!" Officers Armstrong and Agent Clark stated that they did not observe any law enforcement identification displayed on Mr. Lopez' person, nor was Mr. Lopez displaying any type of identification that would identify him as a federal law enforcement officer. However, it should be noted that Officer Martinez indicated in his police report that, "I observed a Hispanic male (later identified as Sergio Lopez) exit the driver's seat of the vehicle and say, "I'm a fucking federal agent!" He flashed a badge at us as he was saying he was a federal agent."

Officer Armstrong and Agent Clark immediately redeployed at their police vehicles. Agent Clark, drew his service weapon and then yelled at Mr. Lopez, "Who are you!" Lopez continued to "scream", "I'm a federal agent, what the hell are you guys doing". Agent Clark responded, "Who do you work for?" Mr. Lopez was very irate, and his behavior, which was described by Agent Clark, as "unlike any I had ever witnessed from an on-duty officer, continued to scream profanities back at us." Agent Clark was still not convinced that he was a Law Enforcement Officer, the agent again ordered Mr. Lopez to identify himself. Mr. Lopez responded, "Customs/ICE", and waved what appeared to be a wallet.

Agent Clark, holstered his weapon and he and Officer Armstrong approached Mr. Lopez, who was still extremely irate. Agent Clark again asked Mr. Lopez to produce his credentials, for identification. However, Mr. Lopez responded, "I don't have to show you anything". Because Agent Clark was not convinced that Mr. Lopez was a federal law enforcement officer, ordered Mr. Lopez to around. Mr. Lopez refused.

Officer Armstrong and Agent Clark grasped Mr. Lopez' right and left arm, and prepared to handcuffing Mr. Lopez. However, Mr. Lopez "tightened up his arms" and began struggling to free himself from the officer and agent's grasps. Officer Armstrong and Agent Clark ordered Mr. Lopez to stop resisting, however, he refused.

Officer Martinez drew his Taser, removed the cartridge and placed the Taser against Mr. Lopez' stomach area and advised him, twice, to stop struggling or he would be tased. Mr. Lopez continued to struggle with the officers and stated, "You better not!" The officers continued to struggle with Mr. Lopez. During the struggle Agent Clark was able to force Mr. Lopez' right arm into the small of his back. The Agent then advised Officer Arm-

3

strong that they were going to take Mr. Lopez to the ground. Officer Armstrong and Agent Clark then took Mr. Lopez to the ground, into a prone position.

Following a brief struggle, Agent Clark and Officer Armstrong were able to place Mr. Lopez' arms into the small of his back. Officer Martinez removed his handcuffs and handed them to Agent Clark. Officers Martinez and Armstrong assisted Agent Clark with the handcuffing of Mr. Lopez' arms behind his back. Mr. Lopez was then placed in a seated position, with his back against a parked vehicle.

Mr. Lopez continued to yell profanities and telling the officers that he was an undercover agent working an operation. Agent Clark asked Mr. Lopez to provided the agent with the name of Mr. Lopez' supervisor. However, Mr. Lopez refused and informed Agent Clark that he would call his supervisor but he would not give Agent Clark the telephone number or name of his supervisor. Mr. Lopez continued to say he was on a high-risk operation and that lives were at risk because the officers had stopped him.

Agent Clark requested a Chula Vista Police Department Supervisor respond to the scene. Shortly thereafter, Uniformed Supervisors W. Fobes and G. Guthrie arrived at the scene. Sergeant Guthrie approached the officers and Mr. Lopez' location and was briefed by Agent Clark. The sergeant then approached Mr. Lopez and was informed by Mr. Lopez that he was a federal officer with ICE. He also informed Sergeant Guthrie that he was on an assignment.

Sergeant Guthrie than requested the name of Mr. Lopez' supervisor. Mr. Lopez responded by telling the sergeant that his Tactical Plan and credentials were inside his vehicle. Sergeant Guthrie looked into Mr. Lopez' vehicle and located the tactical plan and credentials. The sergeant pursued the tactical plan, looking for a supervisors name and telephone number. The sergeant did not locate a supervisors name, however, he did locate the name and telephone number of the case agent. Sergeant Guthrie then utilized Mr. Lopez' cellular telephone and telephoned the case agent. The supervisor talked to the case agent and requested the name of a supervisor or the ongoing ICE operation. The case agent informed Sergeant Guthrie that there was not any supervisor assigned to the operation.

Sergeant Guthrie then contacted the Chula Vista Police Department Dispatch and requested that they contact an ICE supervisor and request that the supervisor respond to the scene. Some time later, Sergeant Guthrie received information that an ICE supervisor had been contacted and the supervisor was responding to the scene.

Some time later, the ICE supervisor arrived at the scene. Sergeant Guthrie briefed the ICE supervisor on what had occurred and why he was being handcuffed. The ICE supervisor asked if he could speak to Mr. Lopez in private. Sergeant Guthrie agreed to the request and instructed the officers to remove the handcuffs from Mr. Lopez. The officers complied and Mr. Lopez and the ICE supervisor met privately.

Following the private meeting the ICE supervisor contacted an ICE district supervisor respond to the scene. Approximately 20-30 minutes later the ICE district supervisor arrived at the scene. The district supervisor was briefed regarding the circumstances of the vehicle stop and the ensuing struggle with the officers. The district supervisor apologized for Mr. Lopez' behavior. Mr. Lopez was subsequently released.

Note: Mr. Lopez alleges in his amended complaint, "...On October 18, 2006, at approximately 10:15 p.m., Plaintiff was performing assigned duties during the operation near the Toys R Us store located at 1008 Industrial Avenue in Chula Vista, California.

Plaintiff was driving on Broadway Avenue just north of H Street in Chula Vista, when he heard Agent Coderes relay via service radio that a red Volkswagen Jetta had pulled into the Toys R Us parking lot and had met with a white pick up truck that had pulled into the parking lot a few minutes earlier...Because he was out of the area, Plaintiff immediately proceeded back. He activated his service vehicle's emergency wigwag, blue and amber emergency lights and siren. Because of the time of night and lack of traffic on the street, he used his siren only while going through intersections.

A short distance later, Plaintiff noticed that there were three marked police cars with their emergency equipment activated, which were now closer behind him. The police vehicles continued to follow Plaintiff. Plaintiff did not want to be near the police cars in the surveillance area, which could draw the attention of the suspects under surveillance. Plaintiff made a right turn and stopped his vehicle, intending to make a U-turn after the police cars had passed. Instead they pulled in behind the Plaintiff.

Plaintiff told the officers that he was a Federal Agent, retrieved and displayed his badge and credentials. Plaintiff was then surrounded by the three officers, who were screaming and yelling.

One officer yelled, "What the fuck are you doing speeding through my city?"

Plaintiff tried several times to explain to the police officers that he was a Federal agent on duty, working in the area and responding to operational traffic. The officers continued yelling. Defendants confiscated Plaintiff's badge, then seized and arrested him.

Defendants were pulling Plaintiff in opposite directions while telling him to stop resisting. Defendants lifted him up; placed him on the rear window of his vehicle; put their weight on the Plaintiff. They pulled Plaintiff's arm so severely that Plaintiff feared his arm would snap.

Plaintiff explained several times that he was not resisting.

During this time, Plaintiff was threatened with a taser gun being held to his stomach.

5

Several police officers forcibly took Plaintiff to the ground. Plaintiff did not resist. Plaintiff's head hit the asphalt. Defendants then handcuffed Plaintiff.

While he was handcuffed, face down, on the ground, two of the officers standing over him had red laser light beams trained at his head. These officers continued aiming these beams even though he would move his head. Plaintiff believes that thelasers were attached to their weapons. The officers kept Plaintiff handcuffed and yelled continually..."

## ANALYSIS AND FINDINGS

The training within the law enforcement community states that a peace officers reason to detain a person must be based on a reasonable suspicion that criminal activity may have taken place or is about to take place, and the person detained is connected to that activity. The reasonable suspicion is based on the totality of the circumstances encountered by the peace officer.

The training also states that occasionally officers in the performance of their duties will encounter situations where the use of force reasonably appears necessary in order to affect a detention, overcome resistance, control a subject or protect themselves or others from injury.

Based on the information I was provided and for reasons stated, it is my opinion the Mr. Lopez' actions justified Officer Armstrong's decision to make a vehicle stop and Agent Clark and Officer Armstrong's decision to use force to take Mr. Lopez to the ground so he could be handcuffed were reasonable. In evaluating Officer Armstrong's decision to make a traffic stop and detain Mr. Lopez and the subsequent use of force these factors are relevant: First, did Officer Armstrong have a rational suspicion that some activity out of the ordinary had taken place and this activity is or has been related to a crime; and second did Mr. Lopez' aggressive and irrational behavior make it necessary for Agent Clark and Officer Armstrong to take Mr. Lopez to the ground, so he could be handcuffed.

When evaluating the first factor, we need to look at what Officer Armstrong was confronted with when he observed Mr. Lopez' vehicle traveling at a high rate of speed south on Broadway Avenue. The officer noted that the vehicle's front headlights were flashing on and off, similar to a police vehicle. Initially, Officer Armstrong did not see any other lights or markings on the vehicle, nor did he hear an audible siren. When the officer pulled in behind the vehicle he noted that the vehicle had red and blue lights flashing in the rear window. He immediately advised dispatch of his observations and continued following the vehicle.

When the vehicle failed to stop for a red tri light signal at the intersection of H Street and Broadway Avenue and not hearing an audible siren, Officer Armstrong activated the emergency lights and siren of his marked police vehicle. Mr. Lopez quickly stopped his vehicle after making a right turn onto Woodland Avenue.

6

Mr. Lopez immediately exited his vehicle and yelled, "What the fuck are you guys doing?" Officer Armstrong and Agent Clark did not see any visible identification on Mr. Lopez' person that identified him as a Federal Officer. Nor did Mr. Lopez attempt to identify himself. According to the Officers account of what occurred, Mr. Lopez would not identify himself, nor tell the officers which Federal Agency he worked for. All Mr. Lopez would say was, "What the fuck are you guys doing?"

In evaluating the detention, we need to look at what the standard of training within the law enforcement community is, regarding a detention. The training tells us that once the officers have stopped or detained a person, they may take what- ever investigative actions which are reasonable under the circumstances to determine the person's possible participation in a crime. Common investigative action may include, questioning the person regarding his identification and conduct. Also an officer may contact other individuals to confirm explanations and to verify identification.

When we take into consideration the second factor, the reasonableness of the use of force, the training tells us that the objective for the use of force by a peace officer in any situation is to ultimately gain or maintain control of an individual and the situation. Additionally, the training tells us that a peace officer need not retreat or desist from his efforts by reason of resistance or threatened resistance of the person being detained.

It is therefore my opinion that the reasonableness of Officer Armstrong and Agent Clark's decision to use deadly force must be viewed from the perspective of the officer at the scene, who is forced to make split second decisions under circumstances that are not only tense and uncertain, but rapidly changing, and most importantly without the advantage of 20/20 hindsight. It is also my opinion that Officers Armstrong, Martinez and Agent Clark's actions were reasonable and conformed with the standard of training and the accepted protocol within the law enforcement community.

I am further of the opinion that Officer Martinez' decision to place his taser in the stomach are of Mr. Lopez and inform him that if he did not stop resisting he would be tasered, was also reasonable and conformed with the standard of training and the accepted protocol within the law enforcement community.

E. J. Pellegrino